BIRDSLEY TRUCKING COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Steven Philhower, Appellee).

Third District (Industrial Commission Division)   No. 3—89—0218WC

Opinion filed December 20, 1989.

Pamela K. Harman, of Cohn, Lambert, Ryan, Schneider & Harman, Ltd., of Chicago, for appellant.

Donna Engels, of Henry S. Dixon, Ltd., of Dixon, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant, Steven Philhower, suffered injuries in a car accident while allegedly driving on a work errand for his employer, Birdsley Trucking Company. Claimant's mother, a passenger in the car, was killed in the accident. An arbitrator awarded claimant $216.39 per week for life, plus interest, and medical expenses of $37,000 for total and permanent disabilities which arose out of and in the course of the employment. The Industrial Commission (Commission) heard additional evidence, and later summarily affirmed the arbitrator's decision, declining to review the record based on the employer's failure to timely file the required written summary of its position. The circuit court of Bureau County confirmed the Commission's decision, and the employer filed an appeal to this court. This court remanded the case to the Commission with directions, and the case came to the Commission for a review on the merits.

The Commission again affirmed the decision of the arbitrator, and the circuit court confirmed the Commission's decision. The employer appeals, contending that the Commission's finding that claimant's injuries arose out of and in the course of his employment is against the manifest weight of the evidence; that the Commission incorrectly computed his average weekly wage; that the Commission erred in awarding benefits for injuries stemming from the personal, and not the business, portion of the trip; that the Commission's award of certain medical benefits is not supported by the record; that one witness' testimony should be stricken in its entirety; that the Commission's alleged loss of certain films inhibits the appeal process; and that the Commission failed to provide a full and complete record for this appeal.

On March 20, 1979, claimant began working for Birdsley Trucking as an over-the-road truck driver/mechanic near Princeton, Illinois. On May 5, 1979, the automobile accident occurred. Claimant was driving his automobile from nearby Ladd, Illinois, where, he testified, he picked up a fuel gauge at Knauf Implements for the truck he drove for respondent. Another car broadsided the passenger side of claimant's car. His mother was killed, and he suffered fractures to the right humerous and left tibial plateau, and a severe closed head injury. He remained in a coma for nearly two months. Subsequently, he has not worked and has been diagnosed as having neurological problems which prevent him from working, and which have resulted in total and permanent disabilities manifested both in neurological problems and gross motor problems.

Claimant introduced numerous medical records into evidence. A

June 11, 1979, EEG showed a "markedly abnormal EEG" with "severe generalized cerebral depression and/or damage indicating the presence of diffuse cerebral dysfunction." A June 27, 1979, EEG showed only slight improvement. A July 10, 1979, discharge summary from one hospital showed a final diagnosis of closed head injury; cerebral contusion and concussion, moderate in intensity; and expressive dysphasia, secondary to the cerebral injuries. Claimant remained hospitalized until August 8, 1979.

Claimant offered an October 14, 1982, report from Dr. James V. Magnuson, a psychiatrist. Dr. Magnuson treated claimant from October 9, 1981, through May 7, 1982. He also reviewed all relevant medical records. Claimant initially complained of disinterest in all activity, mixed sleep disorder, and a sense of being greatly slowed down. He manifested marked psychomotor retardation and difficulty concentrating, and described an intense sense of anhedonia, decreased appetite, and compulsive eating habits. These symptoms began in the summer of 1979.

Dr. Magnuson explained that of particular significance were the closed head injury and prolonged comatose state; his mother's death; and the neurological injury, which was the most enduring factor. Dr. Magnuson noted further that the movement disorder was asymmetrical. A neurological evaluation revealed "increased muscle tone in both upper and lower extremities with the left side being more affected than the right and a decrease in the coordination of muscular actions. These findings do not have localizing significance and therefore stem from a diffuse injury to the central and right sided regions of the brain. Because the brain scan was normal and the injury occurred approximately three years ago, it can be said with confidence that the above described residual from the brain injury is chronic and unredeemable."

Dr. Magnuson reported further that the "functional effects of the neurological damage is [sic] that [claimant] will be unable to operate motor vehicles of the type that had formerly provided his livelihood. In addition, his coordination is interfered with in such a way that he would be prevented from functioning as an effective mechanic even though he appears to retain the knowledge necessary to be a mechanic. Because the deficits are pervasive, he would also be prevented from availing himself of retraining since his performance in all jobs requiring motor coordination would be adversely affected." The neurological and psychiatric disorders would affect claimant adversely for the rest of his life. "In my view, rehabilitation offers [claimant] little hope since his disorders are pervasive[,] affecting his entire person

rather than a single body part or isolated function."

Claimant offered into evidence a November 11, 1980, report from Dr. John H. Van Landingham, a neurosurgeon, who examined claimant on October 31, 1980, and reviewed his medical records. He described the examination: "[Claimant] is obese, unkempt, and unshaven. He has not washed for at least a number of weeks judging by the state of his skin. He walks with a very slow gait with impairment of the normal right arm swing, and he carries his right hand with the fingers somewhat flexed." His neurological examination was normal. Dr. Van Landingham concluded that claimant "suffered a rather severe closed head injury with contusion of the left cerebral hemisphere. In view of my neurological examination at the present time, I am at somewhat of a loss to explain his complaints of inability to walk well and poor motor control of his legs and right arm. On the other hand, I think that these are real symptoms and not due to either a functional disturbance or to malingering, and I suppose are compatible with diffuse cerebral damage."

Claimant offered the May 14, 1985, evidence deposition of Dr. David K. Deets before the Commission. Dr. Deets, a surgeon, testified that he examined claimant four times over a course of four months in 1985. Claimant consistently displayed a degree of expressive aphasia, a slowness in speech. The examinations were normal in most respects. His gait was observed, and claimant was "quite uncertain of walking." He was unsteady. "When he would walk, his right foot would drag just ever so slightly as if he was using it to find his way as someone that had suffered a stroke." He seemed generally uncertain about the right side of his body. He was unclean. Claimant demonstrated a quite labile blood pressure, which is sometimes the result of central nervous system malfunction. He complained of daily headaches and dizziness.

Dr. Deets opined that "because of his apparent problems of expressing himself, of his seeming inability to concentrate at certain times, his generalized depression *** I think the only type of employment *** that I could see [claimant] in would be in a sheltered workshop type of facility perhaps with constant supervision as to details and which would not require any physical stress or fine manipulations." Dr. Deets had "severe reservations" about whether claimant should possess a driver's license at all. To a reasonable degree of medical certainty, claimant could not function as a truck driver or automobile mechanic.

Dr. Deets questioned both claimant's ability to physically exert himself and his mental capabilities to diagnose and repair things. He

could not climb ladders or do general physical labor because of his dizziness. He could not operate farm equipment because of his inability to react or make judgments quickly.

Dr. Deets was shown two films of claimant which were taken by a covert photographer for the employer. As to part of the first film, he did not see claimant walk in that manner in the office. He observed in the film, however, that the "[r]ight arm doesn't seem to swing as much as the left arm does." In regard to the second film, Dr. Deets stated: "That's the way that he walks more often in the office than he did on the other film." The fact that claimant may have worked on cars, driven a pickup for a short distance, or helped out with errands around a farm would not alter Dr. Deets' opinion because "of the sporadic nature of what's been demonstrated *** [that is,] whether he has the endurance to do it day in and day out."

Floyd Philhower, claimant's father, testified that he saw his son at the gas station on May 5, 1979, and claimant mentioned that he was going to Ladd. He did not state the purpose of the trip or that he was taking his mother. After the accident, claimant's father saw Harold Birdsley, claimant's boss, at the hospital. Philhower and his daughter, with Birdsley and his wife following, drove to where claimant's car had been parked. Philhower was retrieving claimant's tools from the car when he found an object and told Birdsley, "I don't know what this piece is." Birdsley replied, "That is what Steve [claimant] was to go after for the truck ***." Birdsley said that he would take the object home with him.

Claimant presently lives with his father. Philhower observed that claimant has trouble performing even small tasks, and can do no heavy work. He has not returned to work. Until shortly before the arbitration hearing, four years after the accident, Philhower always washed and dressed claimant. Claimant was unable to feed himself very well. Philhower prepared all claimant's meals and handled his financial and insurance matters.

Betty Mecum, claimant's sister, testified that in May 1979 she lived at home with her parents and claimant. On the morning of May 5, 1979, she was with her father and Birdsley at the garage where claimant's wrecked car was parked. She heard her father say he did not know what something was, that it was not one of claimant's tools, and Birdsley replied, "This must be what—it looks like something Steve got for the truck." Earlier, Birdsley had telephoned Mecum and said that he expected claimant to work on the truck that morning.

At the arbitration hearing, the 36-year-old claimant testified that when he was hired, he understood that he was to drive Birdsley's

truck and maintain it in good repair. In respect to obtaining parts for the truck, claimant would sometimes drive alone to another city, once to Chicago, and once to Peru, to pick up a part. At other times, claimant and Birdsley drove together to pick up a part. For long-distance trips, claimant would either go in Birdsley's pickup or personal automobile. Birdsley paid for the parts. If claimant "had enough money to possibly pay for the part, I would go without getting money from [Birdsley]." Most of the time, he discussed it with Birdsley first. But usually it was apparent to Birdsley that a part was needed, and Birdsley did not give claimant a direct order to get the part.

Claimant recalled going to the Knauf dealership in Ladd three or four times to pick up something for the truck. Each time, claimant paid for the parts himself. "I would take the receipt back to Harold, show it to him, and his wife would take it as a copy and would give me the money for the amount paid."

On May 3, 1979, claimant returned from delivering a load in Missouri, and Birdsley told claimant he did not have a "job for me to do the next day. And at that rate, I was off the Friday—I think that was May 4th."

On Saturday, May 5, 1979, claimant went for a fuel gauge for the truck. Claimant drove to Knauf's in Ladd. He left home at about 8 a.m., drove to get gasoline, and then returned home, where he lived with his parents, and "picked up my mother to ride along." His mother had no business to do in Ladd.

Claimant recalled driving to Knauf's on County Road M, commonly called the "angling road." Claimant had no recollection of leaving Knauf's. The next thing he remembers is waking up in a hospital bed, five to eight weeks after the accident.

In June 1983, claimant testified before the arbitrator that he was unemployed. He lived with his father, received no benefits from any agency, and had no income. His inability to function as a mechanic had not changed.

In July 1985, claimant testified before the Commission that he remained unemployed. Following this testimony, the Commissioner noted that he observed claimant's sluggishness in speech and gait problems, but stated that he intended to rely more on the medical opinion than his own observation.

Joseph Backes, a truck driver, testified for claimant that he is a truck driver and saw the May 5, 1979, accident occur on the "angling road" to Ladd. Backes approached claimant's car and saw claimant unconscious and convulsing. After the police arrived, Backes went on to his destination, Knauf Implements, in Ladd, to have his truck re-

paired. He told Knauf Employees that he had witnessed the accident. A mechanic commented that claimant "was just over here."

In June 1983, Dr. Jack Skeels testified for claimant as an expert in the field of labor and comparative economics. Using government documents containing information regarding trucking incomes at a variety of levels, he developed and offered an average income in the trucking industry in the Princeton-Peru area. He also used hourly, weekly and annual earnings for trucking companies as reported by the United States Bureau of Labor Statistics through its Chicago office, to develop different annual figures and determine the consistency among them.

Richard Eckohhe, a neighbor, testified for claimant before the Commission that since the June 1983 hearing, claimant's walk had improved. "He used to walk with a shuffle. Now he walks normally but slow and everything he does is slow." Otherwise, Eckohhe had seen no change. He did not believe claimant was employed. Usually he is seen "just walking up and down the street or getting into his old truck, driving away. Very seldom do I see him do that—He is in the house most of the time." Eckohhe observed that in the film shown to him, claimant drove slowly, and there was very little traffic. The films were accurate in their depiction of how claimant moves. When he is on ground that is not level, however, he staggers. Eckohhe has not seen claimant operate his motorcycle at all. Claimant has not tuned his car engine in the last two years.

Greg Steele testified for claimant before the Commission. He is a farm manager, and in December 1983 he very briefly employed claimant to work in the farm shop. Steele noticed slurred speech and slowness in physical movement. There was no job in his farming operation that claimant could handle full time. Only "[v]ery part time, very short period. *** A couple of hours a day, at best, not routine and not every day." He did not possess the physical stamina necessary to function with the livestock.

Janet Sebben testified for the employer that she was employed by Knauf Implement as a bookkeeper, entering billing, invoices and accounts receivable. After the accident she was contacted by an investigator working for Philhower in regard to whether claimant purchased a part on or near May 5, 1979. The investigator went through Knauf receipts and found nothing recording a sale.

Harold Birdsley testified that he hired claimant as a mechanic/driver for Birdsley Trucking, and paid him 25% of the total freight bill. Thus, the "more you keep the truck hauling freight and the less down time, the more money he is going to make." Birdsley also

stated, "The driver has total control of the truck that he drives." If a driver needed expense money while on the road for fuel, tires and lights on the truck, either Birdsley or his wife would give the driver an advance check for expense money.

In regard to the procedure when a repair needed to be done once the truck returned to the terminal, Birdsley stated: "Sometimes I helped the drivers. It was kind of a standard procedure that the drivers maintain their own trucks." Birdsley paid the drivers by the hour for making such repairs. Birdsley "occasionally" sent a driver to pick up a part. Sometimes, but "very seldom," the driver picked up a part using his own automobile. When a driver picked up a repair part, he generally returned with a receipt, which was given to Birdsley for reimbursement and recordkeeping purposes. Claimant had an excellent reputation as a mechanic. Birdsley "very seldom" supervised claimant. He was generally responsible for his own mechanical work.

Birdsley testified further that on May 5, 1979, claimant was supposed to meet him at 9:30 a.m. After stopping at the hospital following the accident, Birdsley accompanied Philhower to the car wreck. Birdsley denied finding or discussing a part with Philhower and denied taking anything away from the car. Birdsley described a fuel gauge as copper, not gray like the object Philhower described. Later, Birdsley worked on the truck which claimant drove for him and concluded it did not need a fuel gauge.

The most direct route between Ladd and Birdsley's place of business was Interstate 80. Birdsley would not consider any secondary road to be more direct. Birdsley was not familiar with the "angling road."

The May 13, 1985, evidence deposition of Dr. James F. Dupre, a neurosurgeon, was offered into evidence before the Commission by the employer. Dr. Dupre testified that at the employer's request he examined claimant. He took claimant's history from his father and reviewed relevant medical records. The examination lasted 30 to 45 minutes. Claimant denied any specific complaints or a change in mentation. His father, however, noted a significant change in mentation since the injury, including being slower mentally and acting slow and sluggish. The neurological examination was normal. Some answers to questions were sluggish. Claimant's gait displayed a slight swaying back and forth without losing his balance, but this was not indicative of anything. Dr. Dupre did not believe it could be accounted for by the injury because he would have expected to find certain objective signs.

During the deposition, Dr. Dupre was shown several films of claimant. Dr. Dupre thought claimant's gait was normal. In viewing

claimant get into a truck and drive away, Dr. Dupre thought that claimant entered the car without difficulty and drove away rapidly.

Dr. Dupre concluded from his examination and review of the records that claimant showed nothing to indicate there was any residual physical or neurological impairment. He believed claimant was capable of "primarily physical rather than mental labor." He could probably climb ladders, paint buildings, work with tools, and drive farm machinery.

Dr. Dupre testified on cross-examination that the abnormal EEGs and the history of unconsciousness for a prolonged period of time indicated the head injury was severe. However, just because "an EEG is abnormal doesn't necessarily mean that that's indicative of something that has recently happened to an individual." Because the second EEG changed only minimally, "that may simply be an indication of the amount of cerebral injury that's been incurred by the injury but it may also be that that is this individual's EEG on a normal basis."

Donald Welter testified before the Commission for the employer that he was employed by an insurance company in March 1985 to place claimant under surveillance and document any physical activities on motion picture film. He took 16 films of claimant. Claimant was observed a total of four days, 8 to 12 hours each day, in March and May 1985. Several films were shown to the Commissioner. In one film, claimant worked under a car, lifted a tail pipe, and tried to wiggle it loose from the muffler itself. Claimant then carried a toolbox and carried a segment of the tail pipe a short distance. Welter did not see claimant perform any other physical activities. In another film, claimant was seen driving an old pickup truck alone. Claimant was never observed doing anything else that was "filmable."

■ The employer contends that the primary issue is whether the Commission's finding that claimant's accident arose out of or in the course of his employment is against the manifest weight of the evidence. We will not disturb the Commission's findings unless they are against the manifest weight of the evidence. (*Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 459 N.E.2d 963.) A reviewing court will not discard permissible inferences drawn from the facts merely because it might have drawn other inferences. *Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.

■ The employer correctly recites the rule that a traveling employee who is injured while on a work errand for his employer is compensated only where the errand or trip is both reasonable and foreseeable to the employer. *Hoffman v. Industrial Comm'n* (1985), 109 Ill. 2d 194, 486 N.E.2d 889; *Wright v. Industrial Comm'n* (1975), 62

Ill. 2d 65, 338 N.E.2d 379; *Bradley Printing Co. v. Industrial Comm'n* (1989), 187 Ill. App. 3d 98, 543 N.E.2d 116.

Claimant testified that he was responsible for maintaining the truck in good repair and that due to his working on a commission, he had an interest in how the truck ran. Similarly, Birdsley testified it was standard procedure for the drivers to maintain their own trucks. Birdsley trusted claimant, who had an excellent reputation as a mechanic/driver, and he did not supervise claimant's every step. Claimant testified he had often gone to other towns to pick up a part for the truck and had been to Knauf's about four times while working for Birdsley. On May 5, 1979, he "went for a fuel gauge because on the truck at that time the only thing that was not working in—was that was not in reasonable working order was a fuel gauge. Because I would have to keep checking the tank with a stick or just looking in to see how much fuel I had." He recalled stopping at Knauf's. Backes testified that after the accident, a Knauf employee reported claimant had just been there. Claimant's father and sister both testified that Birdsley removed a part from the back of claimant's wrecked car and stated that it was the truck part which claimant had gone to get.

■ Thus, the evidence supports the Commission's finding that claimant was engaged in a work-related errand at the time of the accident because claimant drove to buy or inquire about a truck part and was injured on his way back to meet Birdsley.

The employer argues, however, that the trip to Ladd was neither reasonable nor foreseeable because there was a "rule against taking riders on either the truck or any vehicle that was being used to obtain parts." On the contrary, Birdsley only testified that on the road, riders were generally not allowed in the *truck*. While he had not "authorized" a driver to take a rider in any other vehicle, apparently the situation had never arisen. Certainly claimant would be unlikely to ask for permission to let his mother ride in his own car, especially since he was driving a very short distance at 8:30 a.m. to pick up a part before meeting Birdsley at 9:30 a.m. to work on the truck.

The employer argues the trip was not foreseeable because claimant had not discussed the need for the part in advance with Birdsley. Birdsley, however, testified that the driver was responsible for maintaining the vehicle in good repair, that he trusted claimant and did not supervise him. Birdsley only testified that "normally" he might "call around to dealers" to find a part. Apparently the drivers often bought the parts themselves and simply received reimbursement from Birdsley later.

Birdsley only "occasionally" sent a driver for a part. Sometimes a

driver went in his own car, although "normally" Birdsley would offer his car or pickup so he could furnish gas expenses. The Commission could find that the short trip to Ladd, however, was not the equivalent of a trip out of State or to Chicago for a repair part, and the need for gas expense money was minimal or not applicable.

The employer also points out that Sebben, Knauf's employee, could find no receipt for a sale to claimant. If in fact a part was bought, and not just inquired about, there is nothing requiring proof that the wreckage held this slip of paper, or that anyone even looked for the paper. As to Knauf's records of a sale, there is no testimony as to whether the records searched actually identified each purchase by the buyer's name, company he represented, and time and item of purchase.

The employer's contention that this case differs significantly from *Bradley Printing Co.* is not persuasive. In that case, we found that despite the employee's personal deviation by dropping a friend at the airport, it did not alter the overall character of the trip. Similarly, we find here that notwithstanding the presence of another person in the car, the overall character of the trip was clearly for business purposes. We hold, as in *Bradley Printing*, that claimant here was engaged in an activity which he reasonably might be expected to do as part of his employment, and that he was where he reasonably might be expected to be driving, at the time of the accident. There is no evidence indicating claimant veered off onto a course incompatible with his work at any time before the accident. See *Bradley Printing Co.*, 187 Ill. App. 3d 98, 543 N.E.2d 116.

The fact that the employee in *Bradley Printing Co.* had completed the personal aspect of his trip by dropping off a friend at the airport, while claimant here had not dropped off his mother prior to the accident, does not alter our decision. That was merely one factor which the Commission took into consideration when reviewing evidence of reasonable and foreseeable conduct related to the trip. Many additional factors are present in this case which were absent in *Bradley Printing Co.*, and the Commission was entitled to rely upon those factors.

In the alternative, the employer argues that even if it was a "dual purpose trip," the return trip was purely personal, *i.e.*, to return claimant's mother to her home before claimant went on to work. No witness was able to explain the presence of claimant's mother on the trip to Ladd. There is no way of knowing whether claimant was driving her home before going on to meet Birdsley. Regardless, the record supports the Commission's finding that claimant did not leave the

course of his employment by taking his mother along, that the mixed personal and business elements of the trip were reasonable and foreseeable, and that County Road M was only a slight deviation from the more direct route. See *Robinson v. Industrial Comm'n* (1983), 96 Ill. 2d 87, 449 N.E.2d 106.

■ The employer next contends that, if claimant sustained a compensable accident, the Commission erred in computing his average weekly wage. Under section 10 of the Act, compensation shall be computed on the basis of annual earnings if employed continuously during the year preceding the injury by the same employer. But if not employed for a full year, the compensation shall be computed "according to the annual earnings which persons of the same class in the same employment and same location (or if that be impracticable, of neighboring employments of the same kind) have earned during such period." (Ill. Rev. Stat. 1979, ch. 48, par. 138.10(c).) The employer argues the Commission should only use the salaries of two persons in the same class working at its company. The Act does not require the Commission to use the income of co-workers as a basis for determining claimant's average weekly rate. Dr. Skeels' testimony was admitted without objection. Moreover, claimant's average weekly earnings for his six weeks of employment were only 64 cents different from Dr. Skeels' figure.

The employer next contends that the Commission erred in awarding benefits resulting solely from the personal portion of the accident. The employer separates the closed head injury and neurological problems from the depression relating to his mother's death. His mother's "presence in the car and her resulting death are strictly risks personal to" claimant and a "substantial amount of [claimant's] disability appears to stem from depressive illness resulting from his reaction to his mother's death." The employer therefore suggests that temporary disability be awarded from May 5, 1979, up until October 9, 1981, and that permanent disability be confined to "fractures, scarring and any cerebral injury which can be proved."

Minutes after the accident, claimant was found unconscious and convulsing. He remained in a coma for nearly two months. Dr. Magnuson connected the depressive illness directly to the closed head injury and prolonged comatose state, along with claimant's mother's death. The neurological injury, however, was "the most enduring factor." The neurological disturbance would "persist throughout his life and prevent him from realizing his current ambitions to return to a fully normal life style." Drs. Magnuson, Van Landingham and Deets all found an asymmetrical disorder. Dr. Magnuson explained that the

disorder stemmed from a diffuse injury to the central and right-sided regions of the brain. He offered a strong opinion that these residual effects of the brain injury would be "chronic and unredeemable." Similarly, Dr. Van Landingham concluded that the poor motor control and gait problems were "real symptoms and not due to either a functional disturbance or to malingering, and I suppose are compatible with diffuse cerebral damage." Dr. Deets found the neurological injuries resulted in a permanent disability. Eckohhe, Steele, and Mr. Philhower also testified regarding claimant's daily physical manifestations of the neurological problems diagnosed by the physicians.

While Dr. Dupre saw no physical problems while viewing the films, Dr. Deets described in detail the abnormal gait and arm movements seen in the film, noting that it was not as obvious when claimant walked toward a person. Furthermore, Dr. Dupre did observe the sluggish speech and gait problems. Dr. Dupre also testified that the abnormal EEGs and history of unconsciousness for a prolonged period of time indicated the head injury was severe. There is nothing in the record to support his assertion that the EEGs might have always been abnormal in claimant.

Unlike the other doctors, Dr. Dupre found no asymmetrical increased muscle tone, but he acknowledged that such a finding would indicate central nervous system lesion. Although Dr. Dupre found no hygiene problem, he acknowledged that "someone who has a significant change in mentation after a major head injury, may, indeed, lose some of his normal awareness of his body and concern with his body hygiene."

Dr. Dupre testified that he thought in the film claimant moved quickly, walked around a corner rapidly, and drove away quickly. The Commissioner watched the same film and noted that at some points claimant was "walking slowly and the truck went away, it was slower than you see a truck pull out. Those are the clues." In regard to his ability to drive, the Commission was not required to give much significance to claimant's driving an old pickup truck 15 miles an hour for a few miles just outside a rural area of 175 people, and then turning around and going home.

▪ The lengthy surveillance of claimant produced few filmable events. For example, one 12-hour surveillance resulted in one-half hour of filming. The filmmakers saw no one helping claimant wiggle a tail pipe around and carry it away. Yet claimant's sister and niece testified that the niece helped him, and the Commissioner noted her presence in the film. Moreover, the filmmakers remembered little or nothing about the surveillance and apparently made no notes of their

observations. There was ample evidence to support the Commission's award of benefits to claimant.

The employer next argues that the medical award was against the manifest weight of the evidence. It complains that the "Commission has neither enthusiastically nor carefully looked at the medical evidence here. The first appeal to this court was based upon the Industrial Commission's decision to avoid reviewing the record and issue a summary affirmation because the respondent's brief was one day late." Any occurrence which took place in the first appeal is not before us at this time. Moreover, the record belies the employer's assertions. The Commission not only reviewed the evidence thoroughly, but it heard considerable additional evidence, some of which was expressly requested by the Commission.

■ The employer objects to bills of $60 for Dr. Subbiah because the referral to him was by a psychiatrist treating claimant for depression, and $550 for Dr. Magnuson because it was only treatment for depression. We have already rejected the contention that the 10 years of intermittently incapacitating depression are related only to Mrs. Philhower's death and therefore not compensable. The employer also objects to bills of $108 from Bethea Hospital, $55 from Gonstead Clinic, $575 from a chiropractor, and $120 from Princeton Medical because no supporting medical records were offered. We believe the bills from the medical service providers sufficiently support the Commission's award of this $858 portion of the total $37,016 in medical costs.

The employer raises four procedural issues.

■ It argues that Dr. Deets' testimony should be stricken in its entirety because he had papers in front of him during the deposition which he said were unrelated to the case, and which he refused to show the employer's counsel. A great amount of time was spent by the employer arguing this issue at the deposition, before the Commission, and in subsequent proceedings. Dr. Deets' affidavit described the employer's attorney's attempts to physically grab the papers: a personal bank deposit slip, checks, a trust deed to be given to his banker, and a bank foundation report. We find no abuse of the Commission's discretion in making this evidentiary ruling.

The employer also contends that the Commission's loss of seven canisters of film inhibits the appeal process because it impacts upon claimant's credibility. The employer asserts: "However, in considering whether the Industrial Commission has issued its Decision based on the manifest weight of the evidence, Birdsley Truck asks this Court to consider the following factors: that the Commission apparently has misplaced seven canisters of film, that Commissioner Tansor has

failed to give a summary of his recorded observations of the film, if any; that in the deposition transcripts of both Dr. Deets and Dr. Dupre the Commissioner has failed to rule on any of the evidentiary objections made within the body of those transcripts; that the Commissioner failed to send the entire Record to the circuit court of Bureau County in March 1989, and indeed had to file a supplemental certification less than one week before the due date of Appellant Birdsley Trucking Co's brief; as well as their initial attempts to avoid reading and reviewing the Record by reason of Birdsley's brief being one business day late. Under the totality of the circumstances, it seems fair to question whether the Commission had even totally considered the evidence or whether its Decision is based upon the manifest weight of it."

■ Again, we find the record quite clear that the Commission carefully examined the record and additional evidence presented before it. The Commission's decision on remand is lengthy and detailed. As to the lost film, the record clearly shows it is just as possible that the employer lost its own film. In any event, the witnesses who watched the film all described their observations in detail. Moreover, for the reasons noted above, the films suffered from several deficiencies, and there is an abundance of other evidence documenting information relating to claimant's injury, which occurred over a decade ago.

Finally, the employer includes a contention titled: "(Reserve) Whether the Industrial Commission has provided a full and complete Record for this Appeal." The employer argues that the Commission found and certified only two of the four volumes of the record on June 29, 1989. The employer asserts that it reserves the right to argue in its reply brief matters set out in a "transcript received four days earlier." Whatever pertinent material the employer has included in its reply brief and raised at oral arguments has been carefully considered by this court.

For the foregoing reasons, the judgment of the circuit court of Bureau County, confirming the decision of the Industrial Commission, is affirmed.

Judgment affirmed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.